**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STAT IMAGING, LLC,**  Plaintiff,  v.  **MEDICAL SPECIALISTS, INC., P.C.,**  Defendant. | **Case No. 13 C 1921**  **Hon. Harry D. Leinenweber** |

**MEMORANDUM OPINION AND ORDER**

This case involves an undisputed breach of contract. The Plaintiff, Stat Imaging, LLC (hereinafter, the "Plaintiff" or "Stat Imaging"), and the Defendant, Medical Specialists, Inc., P.C. (hereinafter, the "Defendant"), were parties to a Radiology Services Agreement (the "Agreement") which afforded Plaintiff the exclusive right to read certain diagnostic studies. This "right" was terminated by Defendant without any legal justification six months and four days before its expiration. In fact, Defendant stipulated to the entry of judgment against it so that the only remaining issue is the damages suffered by Plaintiff. The parties have now moved for Cross Motions for Summary Judgment on the issue of damages.

**I. BACKGROUND**

Dr. Matthew Eisenstein ("Eisenstein") and Dr. Jeffrey Bernfield ("Bernfield") are co-owners of Stat Imaging LLC, an

Illinois Limited Liability Company. They are also co-owners of Radiology Imaging Solutions, Ltd. ("RIS"), which appears also to be an Illinois Limited liability company. Illinois limited liability companies are popular because owners are not personally responsible for business debts and liabilities and they provide for passthrough taxation. Stat Imaging was the entity that contracted with Defendant. Stat Imaging, itself, had no employees. Both Eisenstein and Bernfield were, in addition to being officers of Stat Imaging, officers and employees of RIS. RIS also employed a third doctor, Satnam Papa. The three doctors did all the reading required under the contract with Defendant but did so in the employ of RIS. While RIS had some business contracts of its own, the major source of funds during the period in question came from Stat Imaging contracts. For some reason, not made clear from the record, most expenses, including all salaries, were paid by RIS. However, because most of the funds went to Stat Imaging, RIS often did not have sufficient funds to pay the expenses. It was therefore necessary for Stat Imaging from time to time to transfer sufficient funds to RIS to make up for the deficiencies. According to its accountant, these fund transfers were carried on the books of Stat Imaging as "administrative management fees." The record contains no explanation for this curious arrangement other than, apparently, RIS was the first business endeavor of Eisenstein and Bernfield and they never bothered consolidating the two entities.

The doctors were careful to make sure that virtually all of the funds for professional services left over after payment of expenses were paid out in the form of salaries to avoid double taxation. The amount of the salaries therefore depended on the success or lack of success of the businesses.

## II. DISCUSSION

The parties agree that under Indiana law (the Agreement stipulates Indiana law applies) a party injured by a breach of contract is entitled to recover the benefit of its bargain. *Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.,* 814 N.E.2d 649, 658 (Ind. Ct. App. 2004). This is defined as "lost net profits*,*" *i.e.,* "the difference between gross profits and the expense of operating the business." *Alover Distributors, Inc. v. Kroger,* 513 F.2d 1137, 1140 (7th Cir. 1975). This means that Plaintiff is not entitled to recover the costs that were avoided in not having to complete the contract. However, fixed costs are not avoided if they were incurred irrespective of the breach. Both parties agree that this is the law in Indiana.

Where the parties disagree is what constitutes avoidable costs. Plaintiff contends that the lost profits amounted to $263,433.50 while Defendant contends that the lost profits amounted to $9,660.00. The parties reach their respective figures by relying on the exact same numbers. Normally avoided costs include the wages saved by avoiding the obligation such as the need to

perform the contractual work.  Where the parties differ is in what each contends are fixed and avoidable costs.  The Defendant points out that the Plaintiff, a corporation, shows on its books that its net profits the year of the breach from fees generated by the contract with Defendant approximated $19,320.00 so that six months would amount to a loss of 50% of this number or $9,660.00.

Plaintiff, on the other hand, argues that these net profit figures were derived solely for income tax purposes and were determined by deducting the salaries paid to the three doctors on the corporate payroll.  When you add in the salaries paid to the doctors, you come up with the $263,433.50 figure.  The issue is therefore quite simple:  do you or do you not deduct the salaries paid the doctors in deriving net profits where the corporation passes the net profits through to the shareholders in the form of salaries?  While neither party has cited any Indiana decisions on this issue there are cases in other jurisdictions that involve the precise issue here: in the professional corporation context, where the principals take virtually all the available income in the form of salaries thus insuring that the corporation will pay very little in taxes, do you or do you not deduct the salaries in calculating net profits.  Unsurprising there are cases that go both ways.

Representative of Plaintiff's position is the case of *Bettius & Sanderson, P.C. v. National Union Fire Insurance Co. of Pittsburgh,* 839 F.2d 1009, 1013 (4th Cir. 1988).  In *Bettius,* a

professional corporation engaged in the practice of law brought suit against its professional liability insurer for breach of contract.  The liability insurer had failed to settle a claim against Bettius, which was determined to be a violation of its policy.  This failure to settle the claims against Bettius in a timely manner caused the firm to lose clients and eventually forced it to dissolve.  It sought loss of profits as damages.  National Union argued that the compensation that Bettius paid to its principals was an expense and not included in net profits because it was operating as a professional corporation and not a partnership.  Thus, like any other corporation, it must deduct the compensation it pays to its officers and employees to calculate its net profits.

The Fourth Circuit rejected National Union's position, pointing out that in a professional corporation, unlike in a business corporation, the principals and shareholders are not treated as separate groups of people.  They are one and the same and in order to avoid having income taxes imposed twice on what, in reality, is the same group of people, all or most of its earnings are distributed to the principals as compensation before calculating the corporation's net income.  Thus, if the professional corporation was treated the same as a business corporation it would seldom if ever be able to show a loss of net income as damages in the event a wrongful act of another.

Contrary to *Bettius* is *Anesthesiologists Associates of Ogden v. St. Benedict's Hospital,* 884 P.2d 1236, 1238 (Utah, 1994). In this case, a professional corporation of anesthesiologists brought suit against a hospital for breach of contract to provide general surgical anesthesia services. The lower court, on the basis of *Bettius,* awarded Plaintiff its loss of net income, including in it the anticipated salaries that would have been paid to its principal shareholders if the remaining term of the contract had been performed. The Supreme Court of Utah, specifically disagreeing with the Fourth Circuit in *Bettius,* reversed, holding that the inclusion of lost salaries as part of net income was error. The court gave several reasons for its opinion: first, it saw no justification for treating professional corporations differently from business corporations just because they were made up of professionals; second, the fact that shareholders and employers were "one and the same" is not the case with many such corporations which have large numbers of non-shareholding associates; third, it believed that the flow of profits to the shareholders in the form of salaries to avoid double taxation was also not unique to professional corporations; and fourth and finally, the court said that, although failing to distinguish professional corporations for different treatment will effectively prevent them from recovering their real net profits lost, to do so would equate the corporation with its shareholder employees contrary to the theory of

incorporation. The hospital had a contractual duty only to the corporation and not to its shareholder employees. If the results seem harsh, it results from a failure to make advanced planning and the doctor's desire to take the advantage of using the corporate structure to avoid taxation.

Since Indiana has apparently not weighed in on this particular issue (at least the parties have not cited any cases and the court has found none), the Court is free to decide the issue on its view of the merits. Having reviewed both cases, the Court believes that the Fourth Circuit has the better argument. The rule applied in Utah, if applied here, clearly does not give the Plaintiff the benefit of its bargain. The Plaintiff contracted to provide exclusive services to the Defendant in return for payment. The Defendant, without any legal basis, terminated the contract with more than six months to run. The Defendant was, therefore, deprived of six months of fees which the parties agree total $263,433.50. While Defendant is entitled to an offset for any expenses saved as a result of not having to complete the contract, Defendant did not identify any such saving other than to contend that the administrative management fee reimbursement paid by Plaintiff to RIS was either not an obligation of Plaintiff or was a variable cost that is not deductible in arriving at net profits lost. However, the "administrative management fee" was a

reimbursement for expenses mainly attributed to salaries of the principals to achieve the passthrough to avoid taxes.

The argument that Plaintiff should not be allowed to take the benefits of an LLC and not take the detriments, is not in the Court's opinion justified. There is no reason for a taxpayer not to minimize its taxes, and, where done legally, there should be no tradeoff required as argued by Defendant and the Utah Supreme Court. To hold otherwise would allow a party to check the corporate structure of its contractors, and, if it is an LLC rather than a partnership, breach the contract without having to pay damages. This does not appear to the Court to be fair.

Certainly the Defendant would be entitled to an offset for failure to mitigate which is, of course, an affirmative defense. The Defendant contends that the payment on the part of Plaintiff to RIS of the administrative management fee was a failure to mitigate because it had no legal obligation to make the payment. However, according to the accountant, this was the way the two corporations had been run for as long as he was associated with them. Thus, there certainly would be an obligation based on practice for Plaintiff to reimburse RIS for the costs it incurred in providing the services to Plaintiff in fulfilling Plaintiff's contractual obligations. Certainly a party who is the victim of a contractual breach, cannot sit back and deliberately refuse work which would offset some or all of its contractual losses. A breach does not

give the victim the right to say: because of the breach I'm going on vacation and sue Defendant for my losses. However, the failure to mitigate is an affirmative defense and Defendant does not provide any evidence indicating that Plaintiff was not actively trying to replace the lost work.

However, Defendant is entitled to an offset due to the reduction in salary paid to the non-shareholder employee, Dr. Papa. The record shows that Dr. Papa earned a salary of $212,715.00 for the year 2012. She was only paid $75,545.00 for the year 2013. Without the breach, she would probably have earned $106,000.00 for the six months remaining on the contract. Since she was paid approximately $38,000.00 for the period, the Plaintiff saved approximately $68,000.00 as a result of the reduced work load. Therefore, Defendant is entitled to an offset of $68,000.00, which reduces to $195,000.00 the amount Plaintiff is entitled to recover from Defendant.

### III. CONCLUSION

The court finds the issues in favor of the Plaintiff and against the Defendant and finds that its damages for breach of contract are $195,000.00. The Defendant has acknowledged that Plaintiff is entitled to the fees associated with ten arthrograms and the cost of tail coverage associated with performing those studies. Indiana law provides for the payment of prejudgment interest where the damages can be ascertained and mathematically

calculated given the terms of the contract.  This is the case here so the Court awards Plaintiff prejudgment interest.  *See, Bank One, N.A. v. Surber,* 899 N.E.2d 693, 705 (Ind. Ct. App. 2009).

**IT IS SO ORDERED.**

                                         _____
                                         Harry D. Leinenweber, Judge
                                         United States District Court

Date:10/17/2014